**\*NOT FOR PUBLICATION\***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAMIE POTTS, KIM MILESZKO, CHRISTINA LUKA, and REBECA GONZALEZ, individually and on behalf of all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>JOHNSON & JOHNSON CONSUMER INC., a New Jersey corporation and DOES 1-50, inclusive,<br><br>Defendant. | Civil Action No. 20-10406 (FLW)<br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Plaintiffs Jamie Potts ("Potts"), Kim Mileszko ("Mileszko"), Christina Luka ("Luka"), and Rebeca Gonzalez ("Gonzalez") (collectively, "Plaintiffs"), brought this consumer fraud-related action against Defendant Johnson & Johnson Consumer Inc. ("JJCI") in connection with the allegedly deceptive labeling and advertising of certain Neutrogena-brand makeup remover cleaning towelettes that purportedly caused adverse skin reactions. Presently before the Court is JJCI's motion to dismiss Plaintiffs' Second Amended Complaint ("SAC") for lack of standing pursuant to Fed. R. Civ. P. 12(b)(1), and, alternatively, for failure to state a claim under Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, JJCI's Motion to Dismiss is **GRANTED in part and DENIED in part** as follows: (i) JJCI's motion is denied as to Counts One through Eight, which are Plaintiffs' "failure-to-warn and omission" claims; (ii) the motion is granted as to Count Nine, negligent omission, and Count Ten, unjust enrichment, and those claims are dismissed without prejudice, with the exception of the New Jersey unjust enrichment claim, which is dismissed with prejudice; and (iii) Plaintiffs' request for injunctive relief is struck from the SAC.

Plaintiffs are given leave to amend their negligent omission and unjust enrichment claims in accordance with the dictates of this Opinion. When amending their complaint, Plaintiffs must also clarify which of the seven products listed in the SAC were purchased and used by Plaintiffs and/or their children. *See infra*. The Third Amended Complaint must be filed no later than 21 days from the date of the Order accompanying this Opinion.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The following factual allegations are taken from Plaintiffs' Second Amended Complaint and are accepted as true for the purpose of this Motion. (ECF No. 14, ("SAC").)

Plaintiffs allege that JJCI, the entity responsible for the labeling and marketing of certain Neutrogena-brand products, engaged in deceptive practices with respect to the labeling and advertising of seven "makeup remover cleansing towelettes" (the "Products").[1] The SAC alleges that the Products are a "cosmetic makeup removing product intended to act as a gentle cleanser that does not irritate the skin but quickly and effortlessly removes makeup from the face and eyes." JJCI allegedly advertises on the Products' labels that the wipes are "Ophthalmologist tested," "Dermatologist tested," and "Allergy tested," which, according to Plaintiffs, creates "the impression in the minds of consumers that the […] Products are ophthalmologist and dermatologist approved, without qualification, and allergen free." (*Id.*, ¶ 18.) Further, Plaintiffs claim that in large, bolded letters, the Products' labels proclaim that the cleansing towelettes are, "Gentle enough to use around sensitive eye area, even for contact lens wearers." (*Id.*)

---

[1]  Plaintiff lists seven Neutrogena-brand Products in the Complaint that allegedly cause adverse skin reactions: "Ultra-Soft Makeup Remover Wipes for Waterproof Makeup"; "Makeup Remover Cleansing Towelettes – Fragrance Free"; "Neutrogena Naturals Purifying Makeup Remover Cleansing Towelettes"; "Makeup Remover Cleansing Towelettes-Night Calming"; "Deep Clean Oil-Free Makeup Remover Cleansing Wipes"; "Deep Clean Purifying Micellar Cleansing Towelettes"; and "Makeup Remover Cleansing Towelettes-Hydrating." (SAC, ¶ 2.)

Plaintiffs allege, however, that "while using the Products as directed, many consumers have experienced adverse reactions ranging from irritation and discomfort to peeling, burning, and temporary or permanent facial scarring." (*Id.,* ¶ 21.) Specific to them, Plaintiffs aver that after applying the Products, Plaintiffs, or their daughters, suffered "adverse skin reactions," including dry skin, rashes, peeling of the skin and other skin irritation, bumps, burning sensations, and skin damage around the areas of use.[2] (*Id.*, ¶¶ 12-15, 27.)

According to Plaintiffs, the Products' labels and marketing were misleading because they failed to include warnings related to the claimed risk of allergic or adverse skin reactions. (*Id.*, ¶¶ 16, 21-29, 36-38, 40-44.) JJCI allegedly knew of customer complaints about such adverse reactions and skin irritation experienced by certain product users, but deliberately chose not to include any warnings on the Products' labeling. (*Id.*, ¶¶ 25-27, 37-39.) In that regard, Plaintiffs allege that, Neutrogena.com, a website run by JJCI, contains "a litany of consumer complaints regarding skin irritation, rashes, chemical burns, peeling, facial disfigurement, and other injuries" from using the Products. (*Id.*, ¶ 26.) Plaintiffs claim that JJCI is clearly aware of these complaints based on the fact that they respond to each negative review with a request for further information.

---

[2]     Plaintiffs Potts, Mileszko, and Gonzalez do not specify which of the seven products caused their alleged injuries. Plaintiffs Potts and Gonzalez only claim they used "Cleansing Towelette products." (SAC, ¶¶ 12, 15.) Plaintiff Mileszko claims she used the "Class Products." (SAC, ¶ 13.) Only Plaintiff Luka specifies that she used the "Ultra Soft variety" of the Products. (SAC, ¶ 14.) As a result, there is confusion surrounding which of the Products the plaintiffs used that caused their alleged injuries. Indeed, Plaintiffs can only establish standing to sue as to the specific product, or products, that caused their injuries. *See Lieberson v. Johnson & Johnson Consumer Co., Inc.*, 865 F. Supp. 2d 529, 537 (D.N.J. 2011) (dismissing allegations regarding products that Plaintiff did not purchase and only considering allegations regarding products that Plaintiff alleges she purchased and used); *see also Koronthaly v. L'Oreal USA, Inc.*, No. 07-CV-5588, 2008 U.S. Dist. LEXIS 59024, at *13 (D.N.J. July 25, 2008) ("standing cannot be predicated on an injury which the plaintiff has not suffered."). I note that JJCI did not seek to dismiss on this basis. Nevertheless, Plaintiffs, when amending the SAC, leave to amend being given, *see infra*, must clarify which product, or products, they, and/or their children, purchased and used.

(*Id.*)  These consumer complaints and responses on Neutrogena.com allegedly date back at least three years.  (*Id.*)  Plaintiffs then claim that in light of such knowledge, certain representations made by JJCI on the Products' labeling, or in product marketing, were misleading or deceptive, in the absence of any warnings.  (*Id.*, ¶¶ 1, 18-20, 22, 30-35.)  Despite the alleged adverse skin reactions, Plaintiffs claim they would "consider purchasing the […] Products in the future if the Products could be made to conform with the affirmative representations" on the Products' labels and in JJCI's marketing, or, if the chemical composition of the Products did not change, the labels and marketing representations "warned that the Products were not suitable for all skin types, a pre-use patch test was recommended, and consumers were advised to cease use and consult a physician if they experienced adverse skin conditions after using the […] Products."  (*Id.*, ¶ 16.)

Plaintiffs first filed this action on April 22, 2020, in California state court, and filed an Amended Complaint on June 19, 2020.  Shortly thereafter, on July 16, 2020, JJCI removed the case to the United States District Court for the Central District of California.  (ECF No. 1.)

On July 29, 2020, Plaintiffs filed the SAC, which asserts ten claims, including: (1) violation of California's Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"); (2) violation of California's False Advertising Law, Cal. Bus. & Prof. Code §§ 17500, *et seq.* ("FAL"); (3)-(5) violations of the California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"); (6) violation of New York General Business Law §§ 349, *et seq.*; (7) violation of New Jersey Consumer Fraud Act ("NJCF"), N.J.S.A. §§ 56:8-1, *et seq.*; (8) violation of Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.*; (9) negligent omission; and (10) unjust enrichment.  (*See* SAC, ¶¶ 55-179.)

On August 11, 2020, the action was transferred to this Court under 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and in the interests of justice.  (ECF No. 16.)  JJCI is

a New Jersey corporation with its principal place of business in Skillman, New Jersey, while

Plaintiffs are residents and citizens of the states of California, New Jersey, New York, and Florida.

(*See* SAC, ¶¶ 9, 12-15.)[3]  Plaintiffs seek certification of a "Nationwide Class," as well as a

"California Subclass," a "New Jersey Subclass," a "New York Subclass," and a "Florida

Subclass." (*Id.*, ¶ 45.)

## I.  STANDARDS OF REVIEW

JJCI moves to dismiss the SAC for lack of jurisdiction pursuant to Rule 12(b)(1) and for

failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

### A. Fed. R. Civ. P. 12(b)(1)

Rule 12(b)(1) mandates dismissal of an action where a federal court lacks subject matter

jurisdiction.  Fed. R. Civ. P. 12(b)(1); *see also Bender v. Williamsport Area Sch. Dist.*, 475 U.S.

534, 541 (1986) (noting that federal courts "have only the power that is authorized by Article III

of the Constitution and the statutes enacted by Congress pursuant thereto").  Once a Rule 12(b)(1)

challenge is raised, the burden shifts to the plaintiff to demonstrate the existence of subject matter

jurisdiction.  *See McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 286 (3d Cir. 2006).

In deciding a Rule 12(b)(1) motion, a district court may treat a party's motion as either a

"facial" or "factual" challenge to the court's jurisdiction.  *See Davis v. Wells Fargo*, 824 F.3d 333,

346 (3d Cir. 2016); *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  "In

reviewing a facial attack, the court must only consider the allegations of the complaint and

documents referenced therein and attached thereto, in the light most favorable to the plaintiff."

*Gould*, 220 F.3d at 176 (citations omitted).  "In reviewing a factual attack, the court may consider

---

[3]      Specifically, Potts is a resident of Los Angeles County in California, Mileszko is a resident of Burlington County in New Jersey, Luka is a resident of Erie County in New York, and Gonzalez is a resident of Broward County in Florida.  (SAC, ¶¶ 12-15.)

evidence outside the pleadings." *Id.* When a motion is treated as a factual challenge, a court "is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," and "[n]o presumptive truthfulness attaches to [the] plaintiff's allegations." *Davis*, 824 F.3d at 346 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)).

### A.    Fed. R. Civ. P. 12(b)(6)

In reviewing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks and citation omitted). While Fed. R. Civ. P. 8(a)(2) does not require that a complaint contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted). Thus, to survive a Rule 12(b)(6) motion to dismiss, the Complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Id.* at 570; *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

To determine whether a plaintiff has met the facial plausibility standard mandated by *Twombly* and *Iqbal*, courts within this Circuit engage in a three-step progression. *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir. 2010). First, the court must "outline the elements a plaintiff must plead to state a claim for relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).

Next, the Court "peel[s] away those allegations that are no more than conclusions and thus not entitled to the assumption of trust. *Id.* Finally, where "there are well-pleaded factual allegations, the court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## II.  ANALYSIS

### A.  Standing

On this motion, JJCI argues that the SAC fails to plead facts sufficient to establish that Plaintiffs have Article III standing.  First, with respect to Potts, JJCI contends that prior to filing suit, Potts received and cashed a refund check from JJCI for the full purchase price of the Product that allegedly caused an adverse skin reaction for her and her daughter.  (*See* Refund Check, Ex. B to the Declaration of Carla Z. Oliveira ("Oliveira Decl."), at ¶ 11.)  According to JJCI, this fact deprives Potts of Article III standing on all her claims, because Potts cannot prove she suffered an injury-in-fact to pursue monetary relief.  (ECF 30, Motion to Dismiss ("MTD"), at 17-21.)  As for the remaining Plaintiffs, JJCI argues that Mileszko, Luka, and Gonzalez also fail to plead facts sufficient to establish Article III standing.  (*Id.* at 21-22.)  Specifically, JJCI submits that it has no record that Mileszko, Luka, and Gonzalez requested, and were denied, a refund of the purchase price paid for allegedly defective products.  (*Id.*)  Thus, according to JJCI, Mileszko, Luka and Gonzalez lack Article III standing because their claimed economic loss in connection with their purchases is not "fairly traceable to the conduct of the defendants."  (*Id.* at 21-22) (citing *In re McNeil Consumer Healthcare*, 877 F. Supp. 2d 254, 275 (E.D. Pa. 2012)).  In addition, JJCI argues that Plaintiffs lack standing because their "price-inflation theory" is too speculative, since they assert claims on behalf of unidentified persons in jurisdictions where Plaintiffs do not allege that they suffered any injury. Finally, JJCI posits that Plaintiffs lack standing to seek injunctive relief,

because they have not established that they are likely to suffer future injury from JJCI's alleged conduct. (MTD, at 23-30.)

In response, Plaintiffs argue that "(1) Article III standing does not require Plaintiffs utilize a privately managed 'refund program' before seeking legal remedy; (2) even if there was such a requirement, [JJCI] deliberately kept the purported 'refund program' secret and out of public view; (3) the particular circumstances of each Plaintiff demonstrates that they each have Article III standing; (4) Plaintiffs may seek injunctive relief to prevent future harm in spite of their knowledge of potential harm in each of the jurisdictions; [and] (5) Plaintiffs['] claims for injunction relief likewise establish Article III standing . . . ." (Pl. Opp. Br., at 7.)

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Lance v. Coffman*, 549 U.S. 437, 439 (2007). "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "The standing inquiry ... focuse[s] on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 360 (3d Cir. 2014) (citing *Davis v. FEC*, 554 U.S. 724, 734 (2008)). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo*, 136 S. Ct. at 1547 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.*

The injury-in-fact element, the Third Circuit has advised, "is often determinative." *Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 138 (3d Cir. 2009). The number of persons injured by the alleged action "does not matter … [and] the party bringing suit must show that the action injures him in a concrete and personal way." *Lujan*, 504 U.S. at 581.

Furthermore, "the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984).

While "general factual allegations of injury resulting from the defendant's conduct may suffice, the complaint must still 'clearly and specifically set forth facts sufficient to satisfy' Article III" at the pleading stage." *Reilly v. Ceridian Corp.*, 664 F.3d 38, 41 (3d Cir. 2011) (quoting *Lujan*, 504 U.S. at 561); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990); *see, e.g.*, *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 88 (3d Cir. 2000) ("Standing is established at the pleading stage by setting forth specific facts that indicate that the party has been injured in fact or that injury is imminent, that the challenged action is causally connected to the actual or imminent injury, and that the injury may be redressed by the cause of action.").

In this case, Plaintiffs' theory of economic harm is based on their allegations that they did not receive the benefit of their bargain due to JJCI's alleged omissions and misrepresentations. (SAC, ¶ 48(e).) Plaintiffs' claims can be summarized in the following way: Plaintiffs allege that they bought and used Neutrogena face wipes; the wipes were harmful to them because they suffered rashes, swellings, peeling skin, and burning sensations after the use of the Products; and JJCI knew that the Products caused harmful reactions, purposefully did not list warnings about the alleged risks, and misrepresented the degree of the Products' safety, thereby misleading Plaintiffs into purchasing the Products that they otherwise would not have, had they been warned.

1. Refunds

As a preliminary matter, in the SAC, Plaintiffs allege that they suffered physical injuries. (Pl. Mov. Br., at ¶¶ 13-15.) Based on those injuries, Plaintiffs allege that they purchased Products that did not perform as advertised, and thus, were worth less than that for which Plaintiffs

bargained. (SAC, ¶¶ 48(e), 99, 128); *Estrada v. Johnson & Johnson*, No. 16-7492, 2017 U.S. Dist. LEXIS 109455, at *17 n. 2 (D.N.J. July 14, 2017), *aff'd*, 903 F.3d (3d Cir. 2018); (recognizing that in a products-liability case, a plaintiff may establish standing by alleging physical harm); *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014) (recognizing that physical harm and economic harm are distinct and well-established types of injury that can give rise to standing); *Backus v. Gen. Mills*, 122 F. Supp. 3d 909, 918-21 (N.D. Cal. 2015) (finding that plaintiff's alleged physical injury—organ inflammation—and alleged economic injury—lost money from purchasing baking products that plaintiff claimed negatively impacted his health—were sufficient to confer standing.).

Pursuant to their economic theory, Plaintiffs seek "either (1) the full purchase price [paid by] customers who purchased [the Products], or (2) a portion of the purchase price paid by customers who purchased [the Products] reflecting the difference in value between what Defendant represented to consumers and the product that Defendant actually delivered to consumers." (SAC, ¶ 95.) This theory of economic harm is sufficient to establish standing. *See, e.g.*, *Marcus v. BMW of N. Am.*, *LLC*, 687 F.3d 583, 606 (3d Cir. 2012) ("[A] plaintiff is not required to show monetary loss, but only that he purchased something and received 'less than what was promised.'") (quoting *Union Ink Co., Inc. v. AT&T Corp.*, 352 N.J. Super. 617, 801 (App. Div. 2002)); *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 99 (D.N.J. 2011) ("The Consumer Fraud Act requires nothing more than that the consumer was misled into buying a product that was ultimately worth less than to the consumer than the product that was promised."); *In re Johnson & Johnson Talcum,* 903 F.3d at 292 ("In order to allege that she has suffered an economic injury as a result of simply purchasing Baby Powder, Estrada must allege that she purchased Baby Powder that was worth less than what she paid for."); *Degelmann v. Advanced Med. Optics Inc.*, 659 F.3d 835, 840 (9th Cir.

2011) ("[Plaintiffs] presented evidence that they were deceived into purchasing a product that did not disinfect as well as it represented. Had the product been labeled accurately, they would not have been willing to pay as much for it as they did, or would have refused to purchase the product altogether."); *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 329-30 (Cal. 2011) (concluding that plaintiffs' theory of the economic harm established standing where consumers allege they "purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately."); *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 453-54 (E.D.N.Y. 2013) (Plaintiffs' allegations that they would not have paid more for an immune support product "[h]ad [they] known the truth that the statements [they] relied on were false, misleading, deceptive, and unfair" was "sufficient economic injury for purposes of clearing standing's injury bar."). Accordingly, I find that Plaintiffs have set forth sufficient factual allegations to permit a factfinder to conclude that they suffered at least some modicum of economic injury.[4] *Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005).

JJCI's argument that a refund deprives Plaintiffs of standing is unconvincing for several reasons. In addressing JJCI's argument, the Court notes that the plaintiffs fall into two categories: (1) Plaintiff Potts who received a refund, and (2) the remaining plaintiffs who JJCI argues did not take advantage of purported refund program.[5] First, in support of their argument, JJCI cites to the

---

[4]     Having found that Plaintiffs' satisfied their standing requirements based on their alleged physical injuries and economic harm, the Court need not address JJCI's remaining argument that Plaintiffs lack standing due to a speculative price-inflation theory. (MTD, at 24-27.) Notably, JJCI's price-inflation argument rests heavily on the same data "from adverse event reports" (*Id.* at 28, 33-35), that the Court declines to consider on a motion to dismiss when considering JJCI's argument that it does not owe a duty-to-warn Plaintiffs. *See infra.*

[5]     JJCI claims it has a refund program to provide "full refunds to unsatisfied consumers who request" refunds. (MTD, at 1, 7.) Specifically, those customers who make a "product quality complaint to JJCI" can "receive a replacement product, a voucher, or a full refund of the purchase price paid" on request. (*Id.* at 8.)

Ninth Circuit case, *Luman v. Theismann*, which affirmed, in part, the dismissal of a plaintiff's individual claim for monetary relief in a consumer class action brought under California consumer fraud statutes. 647 Fed. App'x 804, 806-07 (9th Cir. April 8, 2016). The plaintiffs in *Luman* alleged that the defendants misrepresented the effectiveness of a prostrate disease treatment product, Super Beta Prostate, and brought breach of warranty and false advertising claims based on the allegation that Super Beta Prostate allegedly did not safely and effectively treat the plaintiffs' condition as advertised. *Luman v. Theismann*, No. 2:13-cv-00656-KJM-AC, 2014 U.S. Dist. LEXIS 14038, at *2 (E.D. Cal. Feb. 3, 2014). The defendants argued that one plaintiff lacked standing to sue because he was made whole by virtue of receiving a refund for his purchase. *Id.* at *9. The district court, in dismissing the action, noted that the plaintiffs were not seeking other forms of relief for other injuries as a result of using the defendants' product, "such as a worsening [of] his prostrate condition or other physical harm," and, therefore, "received complete restitution." *Id.* at *14. The Ninth Circuit concluded the plaintiff "no longer met the injury-in-fact requirement for standing at the time he filed his complaint." *Luman*, 647 F. App'x at 807.

Here, unlike the plaintiff in *Luman*, Plaintiffs, including Potts, do allege that they suffered physical injuries from the use of JJCI's products—Plaintiffs claim they developed rashes, inflamed, itchy and peeling skin, and burning sensations. (SAC, ¶¶ 13-15.) Moreover, while JJCI argues that Potts is similar to the plaintiff in *Luman* because she received a refund for $6.50, (*see* Oliveira Decl., ¶ 11 & Ex. B), Potts maintains that the $6.50 reimbursement she received "does not fully compensate her for the $13.99 plus tax that she paid at the time of purchase." (*See* Declaration of Jamie Potts in Support of Plaintiffs' Opposition to Defendant's Motion to Dismiss, ¶¶ 2-6.) No such factual dispute was present in *Luman* "where it appear[ed] [the defendant] remitted the refunds" to the plaintiff for the full purchase price of the product and the plaintiffs did

not challenge that they were fully refunded. *Luman*, 2014 U.S. Dist. LEXIS 14038, at *4-5. JJCI's reliance on *Luman*, therefore, is unpersuasive.

As for Plaintiffs Mileszko, Luka, and Gonzalez, JJCI argues that they "must" allege that they sought a refund and were subsequently denied a refund by JJCI, and their failure to do so demonstrates a lack of standing. (MTD, at 21-22.) In support of its argument, JJCI relies on *In re McNeil Healthcare*, 877 F. Supp. 2d 254 (E.D. Pa. 2012).

As a general matter, a plaintiff's failure to seek or accept a refund does not preclude standing. *See Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 165-66 (2016) ("[A]n unaccepted settlement offer … does not moot a plaintiff's case."); *Laurens v. Volvo Cars of N. Am., LLC*, 868 F.3d 622, 627 (7th Cir. 2017) (finding that an unaccepted refund offer made prior to suit does not deprive plaintiffs of standing); *In re Mattel, Inc.*, 588 F. Supp. 2d 1111, 1117 (C.D. Cal. 2008) ("[U]nilateral offering of a remedy by a defendant does not change the fact that a plaintiff has been injured."); *see also Martelack v. Toys R Us*, No. 13-7098, 2016 U.S. Dist. LEXIS 23271, at *7 (D.N.J. Feb. 25, 2016) (defendant's unaccepted tender of a check did not moot plaintiff's unpaid wage claims against employer) (citing *Gomez*, 577 U.S. at 165-66). Even the court in *In re McNeil,* a case upon which JJCI relies, "accept[ed] that the mere existence of a refund offer is not sufficient to defeat standing." *In re McNeil*, 877 F. Supp at 273.

*In re McNeil* involved over-the-counter medications manufactured by the defendants, and some of those medications were subject to a recall. *In re McNeil,* 877 F. Supp. 2d at 257. Twenty-four plaintiffs alleged that the defendants concealed the products' quality control issues, which led to the plaintiffs paying inflated prices for the inferior products. *Id.* For the products that were recalled, the plaintiffs alleged that defendant's official refund program would be adequate to compensate fully for their economic injuries. *Id.* at 273. As here, those twenty-four plaintiffs were

grouped into two categories: those who sought a refund and those who did not. *Id.* at 273-77. The court found while plaintiffs alleged facts that demonstrated they were entitled to a refund, due to a "speculative chain of inferences" based on experiences that *other* plaintiffs had with the refund program, they "elected not to receive one." *Id.* 275-76. The court concluded that "[a]lthough the defendants' refund program cannot defeat standing on its own, the absence of any allegation that the refund offer was insufficient *based on the experience of a named plaintiff* is fatal." *Id.* at 273 (emphasis in the original) (citing *Lujan*, 504 U.S. at 560 n.1). In other words, the plaintiffs could not, for standing purposes, allege that they suffered an injury-in-fact by relying on the experiences *others* who had with the refund program to show that the program was somehow inadequate. *Id.* at 276.

Based on the factual circumstances and pleadings in *In re McNeil*, that case is distinguishable. Here, noticeably lacking is any allegation of a refund program in the SAC. Even if JJCI's unofficial refund program exists, there are no allegations that it would have made Plaintiffs whole. For one, Plaintiff Potts claims that she only received a partial refund. But, more importantly, each plaintiff alleges that he/she suffered a physical injury that a refund could not compensate: Plaintiff Mileszko claims she purchased the Products for her daughter and that her daughter developed "visibly raised bumps" that caused "burning and discomfort" and skin peeling. (SAC, ¶ 13.) Plaintiff Luka alleges she used the Products around her eyes and cheeks and developed "inflamed and itchy" skin and swelling around those areas. (*Id.*, ¶ 14.) Plaintiff Gonzalez alleges similar experiences of "red and inflamed" skin and itching and burning sensations following use of the Products. (*Id.*, ¶ 15.) Those injuries are also fairly traceable to JJCI's alleged wrongful conduct—Plaintiffs allege that JJCI's products include misleading information about the Products' qualities and omit necessary warnings about potential adverse skin

reactions that were suffered by some consumers of which JJCI was aware. (Pl. Mov. Br., at ¶¶ 12, 16, 23, 26, 27, 44, 165.) Accordingly, I reject JJCI's argument that the failure to apply for a refund deprives Plaintiffs standing to bring suit.

2. Injunctive Relief

Next, JJCI argues that Plaintiffs cannot seek injunctive relief, because they were aware of the supposed risks of using the Products, and therefore, cannot reasonably claim that they are likely to buy the Products again in the immediate future. (MTD, at 23-24.) In other words, JJCI argues that Plaintiffs cannot show an ongoing harm such that they can seek injunctive relief. I agree.

In order to have standing to seek injunctive relief, Plaintiffs must establish that they are "likely to suffer future injury from the defendant's conduct." *McNair v. Synapse Group Inc.*, 672 F.3d 213, 223 (3d Cir. 2012) (citation omitted). When seeking prospective injunctive relief, the plaintiff must allege the likelihood of future or continuing harm. (*City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).

Plaintiffs claim they "would consider" and "desire" purchasing the Products for themselves and others in the future if: (1) the labels and JJCI's marketing representations provided warnings that the Products "were not suitable for all skin types", (2) if JJCI recommended "a pre-use patch test", and (3) also "advised to cease use and consult a physician if the[y] experienced adverse skin conditions after using" the Products. (SAC, ¶¶ 16, 77.) However, Plaintiffs candidly acknowledge that they are unable to rely on the Products' labels to "know if the issue complained of has been rectified." (Pl. Opp. Br., at 32.) Because Plaintiffs state clearly that they have suffered adverse skin reactions from use of the Products, and are obviously aware of the alleged risks associated with such use, I conclude that Plaintiffs cannot establish that they are "likely to suffer future injury

from the defendant's conduct." *In re Johnson & Johnson Talcum,* 903 F.3d at 292 (quoting *McNair*, 672 F.3d at 223).

Under these circumstances, Plaintiffs' alleged desire to purchase the Products in the future as a means of establishing the likelihood that they will suffer an ongoing harm, is pure speculation. *Id.* at 225 ("law accords people the dignity of assuming that they act rationally, in light of the information they possess."); *see also In re Johnson & Johnson Talcum,* 903 F.3d at 292-93 (rejecting plaintiff's claim of a desire to purchase allegedly harmful product in the future as a means of establishing the likelihood of future injury). As the court in *In re Johnson* explained, a plaintiff's appreciation for the alleged risks raises the question as to how they can fall prey twice to defendant's alleged deceptive conduct without being aware of those same risks. *Id.* Accordingly, because I find that Plaintiffs have failed to establish a reasonable likelihood of future injury, their request for injunctive relief is struck from the SAC. *See Lyons*, 461 U.S. at 109 (denying plaintiff's injunctive relief request because he could not demonstrate "a reasonable showing that he will again be subjected to the alleged illegality.").

## B. Failure to State a Claim

### 1. Failure-to-Warn and Omission Claims

JJCI contends that Plaintiffs' "failure-to-warn and omission" claims[6] fail under Rule 12(b)(6) on two grounds. First, JJCI argues there is no duty to warn of "rare, idiosyncratic, hypersensitive, or unusual reactions" to the Products under California, New York, Florida, and New Jersey law. (MTD, at 30-35.) Second, JJCI claims Plaintiffs' failure-to-warn and omission claims are expressly and impliedly preempted by federal law. (*Id.*, at 35-41.)

---

[6] JJCI refers to the violations of various states' consumer protection statutes as Plaintiffs' "failure-to-warm and omission" claims, which encompasses Counts One through Eight of the SAC, and it seeks to dismiss those claims based on preemption and lack of duty-to-warn.

In making the argument that it does not owe a duty to warn consumers, JJCI claims that Plaintiffs failed to plead "*any actual facts* sufficient to allege that the claimed adverse skin reactions are anything other than rare, unusual, and experienced at most by an infinitesimally small" number of users. (MTD, at 33) (emphasis in original). As proof that adverse skins reactions are rare, JJCI provides, for example, a declaration from Kenneth Henderson, who certifies that he was employed by JJCI from September 2017 through September 2010 as Senior Director, North America Regional quality & Compliance. (*Id.*, Ex. A to the Declaration of Kenneth Henderson, at ¶ 1). Relying on that declaration, JJCI explains that "event reports for the Products" used in the United States were reviewed by JJCI who determined that from April 1, 2015, through June 30, 2017, there were total of 254 adverse event reports out of 80,349,358 units of the Product "distributed" throughout the country. (*Id.*, at 8-9.) According to JJCI, 99.6% of the 254 adverse events were "non-serious and transient in nature." (*Id.*) JJCI concludes that this adverse reaction rate falls into the category of "very rare" under the Guidelines of the Council for International Organizations of Medical Science's guidelines. (*Id.*, at 10, 34); (*see* MTD, Ex. B, *Allergens in Cosmetics*). This argument, however, is cannot be made and supported on a motion to dismiss.

First and foremost, the Court may not consider documents, such as the certifications that JJCI attaches, here, unless the document's authenticity is undisputed by the plaintiff and "plaintiff's claims are based on the document." *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). JJCI does not—nor could it—argue that Plaintiffs relied on the documents in their SAC. Furthermore, Plaintiffs object to these studies as being "self-conducted, exculpating" and outside the scope of the pleadings. (Pl. Opp. Br., at 38.) Indeed, the

Court cannot dismiss, at this stage, Plaintiffs' claims based on JJCI's proposed theory that because the alleged unusual reactions are rare, there is no duty to warn consumers regarding the alleged adverse reactions suffered by Plaintiffs, because doing so would go beyond the face of the pleadings.

### 2. Preemption

Second, JJCI contends that Plaintiffs' "failure-to-warn and omission" claims, found in Counts One through Eight of the SAC, are expressly and impliedly preempted by federal law. In analyzing JJCI's preemption argument, the Court begins with the well-established legal assumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

The Federal Act in question here, the Food, Drug and Cosmetic Act ("FDCA"), establishes broad proscriptions for cosmetics labeling. For example, labeling that is "false or misleading in any particular" under 21 U.S.C. § 362(a), "shall be deemed to be misbranded." [7] 21 U.S.C. § 362,

---

[7] A cosmetic shall be deemed to be misbranded—

(a) If its labeling is false or misleading in any particular.

(b) If in package form unless it bears a label containing (1) the name and place of business of the manufacturer, packer, or distributor; and (2) an accurate statement of the quantity of the contents in terms of weight, measure, or numerical count: Provided, That under clause (2) of this paragraph reasonable variations shall be permitted, and exemptions as to small packages shall be established, by regulations prescribed by the Secretary.

(c) If any word, statement, or other information required by or under authority of this Act to appear on the label or labeling is not prominently placed thereon with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use.

(d) If its container is so made, formed, or filled as to be misleading.

(e) If it is a color additive, unless its packaging and labeling are in conformity with such packaging and labeling requirements, applicable to such color additive, as may be contained in regulations issued under section 721 [21 USCS § 379e]. This paragraph shall not apply to packages of color additives which, with respect to their use for cosmetics, are marketed and

*et seq.* The FDCA's preemption specific statute is contained in 21 U.S.C. § 379s, *et seq.* JJCI points to § 379s(a), which prohibits states and local government from "establish[ing] or continu[ing] in effect any requirement for labeling or packaging of a cosmetic that is different from or in addition to, or that is otherwise not identical with" federal guidelines. 21 U.S.C. § 379s(a). JJCI contends that this language expressly preempts Plaintiffs' "additional state-law warnings and disclosure requirements" of California, New York, New Jersey, and Florida, because those laws, JJCI argues, go beyond the FDA's disclosure requirements. (MTD, at 36-37.)

On the other hand, Plaintiffs argue that the FDCA does not preempt state laws that are aligned with the federal statute. *See Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 35 (2d Cir. 2020). They further argue that the various state statutes governing cosmetic labeling are either identical or substantially similar to the requirements under the FDCA, which prohibits "labeling that is false or misleading in any particular." (Pl. Opp. Br., at 35-36); *see* 21 U.S.C. § 362(a); N.J.S.A § 24:5-18.1; N.Y. Educ. Law § 6818; Cal. Health & Safety Code § 111730; Fla. Stat. Ann. § 499.009. Plaintiffs also contend that JJCI failed to inform consumers of material information regarding the safety of the Products in violation of 21 C.F.R. § 740.1, which requires a manufacturer to include in its product labels, "a warning statement whenever necessary or appropriate to prevent a health hazard that may be associated with the product." (Complaint, at ¶ 28) (citing 21 C.F.R § 740.1).

Importantly, JJCI overlooks § 379s(d) of the FDCA which states that "[n]othing in this section shall be construed to modify or otherwise affect any action or the liability of any person under the product liability law of any State." 21 U.S.C. § 379s(d). Contrary to JJCI's assertion,

---

intended for use only in or on hair dyes (as defined in the last sentence of section 601(a) [21 USCS § 361(a)]).
(f) If its packaging or labeling is in violation of an applicable regulation issued pursuant to section 3 or 4 of the Poison Prevention Packaging Act of 1970 [15 USCS § 1472 or 1473].

the FDCA does not amount to an absolute bar to Plaintiffs' state products liability claims in this context. In fact, Congress, through § 379s(d)'s savings clause, expressly preserved state product liability actions involving cosmetics. *See Wyeth v. Levine*, 555 U.S. 555, n.8 (2009); *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753 (9th Cir. 2015) (concluding that "the FDCA does not preempt state laws that permit consumers to sue cosmetics manufacturers that label or package products in violation of federal standards."); *In re Epogen & Aranesp Off-Label Mktg. & Sales Practices Litig.*, 590 F. Supp. 2d 1282, 1290 (C.D. Cal. 2008) (holding that "[t]he existence of the FDCA does not completely preclude injured parties from asserting claims of fraud or false advertising. Other legislation, state and federal, remains in effect to protect consumers from false and deceptive prescription drug advertising"); *Jovel v. I-Health, Inc.*, No. 12-5614, 2013 U.S. Dist. LEXIS 139661, at *15 (E.D.N.Y. Sep. 27, 2013).

Tellingly, JJCI fails to explain how Plaintiffs' state law claims require labeling or packaging of a cosmetic that differs from, or adds to, the federal guidelines. Moreover, significantly, JJCI has not pointed to any federal requirements that govern the labeling of their products that contradict the type of labeling Plaintiffs seek to impose through state law. Rather, the FDCA prohibits false or misleading labeling of cosmetics, *see* 21 U.S.C. §362(a), in similar fashion as to states' laws that Plaintiffs rely upon as bases for violations of the consumer fraud statutes. *See, e.g.,* N.J.S.A § 24:5-18.1; N.Y. Educ. Law § 6818; Cal. Health & Safety Code § 111730; Fla. Stat. Ann. § 499.009. Indeed, "[P]laintiffs' claims, if proven to be true, would simply require Defendant to truthfully state [the] efficacy [of its products] or not sell its products; such relief would not impose a state requirement that is 'different from or in addition to, or that is otherwise not identical with' that of the FDCA." *Reid v. GMC Skin Care USA Inc.*, No. 15-277, 2016 U.S. Dist. LEXIS 14001, at *28 (N.D.N.Y. Jan. 15, 2016) (quoting *Delarosa v. Boiron, Inc.*,

818 F. Supp. 2d 1177, 1189-90 (C.D. Cal. 2011)).    Accordingly, I reject JJCI's assertion that Plaintiffs' "failure-to-warn and omission" claims, *i.e.*, Counts One through Eight, are preempted "unless and until the FDA determines the Products violate the FDCA and 21 C.F.R. § 740.1." (MTD, at 41.)

Accordingly, JJCI's motion to dismiss is denied as to the "failure-to-warn and omission" claims and they shall proceed.

### 3.   Negligent Omission Claim

Next, JJCI submits that Plaintiffs' claim for "Negligent Omission" should be dismissed, because the economic loss rule bars Plaintiffs' claim under the laws of New York, New Jersey, and Florida, and separately, California law does not recognize "negligent omission" as a cause of action.  (*Id.*, at 42-47.)  Plaintiffs, however, in reply, do not challenge JJCI's argument.  Instead, Plaintiffs ask the Court for leave to amend their negligent omission claims "to incorporate contractual theories of recovery upon which a [n]egligent [o]mission claim may be predicated." (Pl. Reply Br., at 47.)  In short, Plaintiffs have conceded that failed to sufficiently plead this claim, and therefore, it is dismissed without prejudice.

### 4.   Unjust Enrichment Claim

Finally, JJCI argues that Plaintiffs' unjust enrichment claim should be dismissed, because it is an equitable relief claim based on the same allegations as Plaintiffs' legal claims, and Plaintiffs have not shown that they lack an adequate remedy at law.  (MTD, at 47.)  Relying solely on New Jersey law, JJCI maintains that dismissal of this claim is appropriate, because the SAC alleges that each of the named Plaintiffs purchased the Product from third-party retailers, and not directly from JJCI.  (*Id.* at 48.)  According to JJCI, this fact prevents Plaintiffs from establishing the requisite "direct relationship" between plaintiff and defendant that New Jersey law demands for any viable

unjust enrichment claim. (*Id.* at 48-49) (citing *Hughes v. Panasonic Consumer Elecs. Co.*, No. 10-846, 2011 U.S. Dist. LEXIS 79504, *78-79 (D.N.J. July 21, 2011)).

As an initial matter, Plaintiffs, in the Complaint, assert that JJCI "benefitted from selling, at an unjust profit, mislabeled and dangerous [] Products that had artificially inflated prices due to" JJCI's alleged "concealment of the potential for serious injury," and "received and retained unjust benefits from Plaintiffs and the other members of the Nationwide Class and state Subclasses." (SAC, ¶¶ 174-75.) While Plaintiffs seek to bring unjust enrichment claims under the laws of California, Florida, New Jersey, and New York, they do not specifically allege any of the elements of each of the state's law; rather, their allegations are too conclusory to pass Rule 12(b)(6) muster. Put simply, on their face, Plaintiffs' unjust enrichment claims are not sufficiently pled.

In any event, I find that Plaintiffs may not bring a New Jersey unjust enrichment claim. Indeed, JJCI correctly argues that in order to claim unjust enrichment, New Jersey law requires a direct relationship between the parties. *Cooper v. Samsung Elecs. Am. Inc.*, No. 07-3853, 2008 U.S. Dist. LEXIS 75810, at *29-31 (D.N.J. Sep. 29, 2008) (plaintiff's purchase of television through third-party retailer did not directly confer benefit on manufacturer-Samsung within the meaning of New Jersey's doctrine of unjust enrichment.); *Premier Pork L.L.C. v. Westin Inc.*, No. 07-1661, 2008 U.S. Dist. LEXIS 20532, at *41 (D.N.J. Mar. 17, 2008) ("[Q]uasicontract claims involve either some direct relationship between the parties or a mistake on the part of the person conferring the benefit."); *Union Trust Co. of Md. v. Wakefern Food Corp.*, No. 86-728, 1989 U.S. Dist. LEXIS 11754, at *62 (D.N.J. Sep. 8, 1989) ("[U]njust enrichment requires a relationship or course of dealings between parties which, if left undisturbed by the intervention of the law, permits one party to obtain 'unjust enrichment or unconscionable advantage' over the other.") (citation

omitted); *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105, 109 (App. Div. 1966) (citing importance of either a direct relationship or a mistake in quasi-contract).

Here, Plaintiffs are consumers who purchased the Products from third-party retailers, such as CVS Pharmacy and Costco. And, there is no dispute that Plaintiffs did not purchase the cosmetic products directly from JJCI, which is a manufacturer, not a retailer. In that respect, Plaintiffs did not confer any benefit directly on JJCI. Hence, Plaintiffs cannot sustain an unjust enrichment claim under New Jersey law.

Although the Court is giving Plaintiffs leave to amend their unjust enrichment claims pursuant to the laws of California, New York and Florida--since they are not adequately pled, and because JJCI has not addressed the substantive law of these states, as it did for New Jersey--when amending, Plaintiffs are well-advised that these states differ as to whether a plaintiff must directly confer a benefit on a defendant in order to adequately plead an unjust enrichment claim.

A review of Florida law indicates that, like New Jersey, Florida requires that a party confer the benefit directly, as well. *See, e.g., Am. Safety Ins. Serv., Inc. v. Griggs*, 959 So. 2d 322, 331 (Fla. Dist. Ct. App. 2007) ("[P]laintiffs must show they directly conferred a benefit on the defendants."); *Peoples Nat'l Bank of Commerce v. First Union Nat'l Bank of Florida*, 667 So. 2d 876, 879 (Fla. Dist. Ct. App. 1996) ("[T]he plaintiff … could not and did not allege that it had directly conferred a benefit on the defendants."); *Nova Information Sys., Inc. v. Greenwich Ins. Co.*, 365 F.3d 996, 1006-07 (11th Cir. 2004) (plaintiff's reimbursement to third-party did not confer a direct benefit on the defendant, and at most conferred an indirect or incidental benefit). Also, in addition to the three elements of unjust enrichment outlined *supra*, Florida requires that a

plaintiff satisfy an additional element: that the defendant "had knowledge"[8] of the benefit conferred on them.

New York's theory of unjust enrichment requires three elements that are similar to New Jersey's: (1) "the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience [to permit the other party] to retain what is sought to be recovered. New York law also appears to require that the benefit be conferred directly." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citations omitted)). However, there appears to be disagreement amongst the courts of New York as to the degree of the relationship that is needed between the parties to sustain an unjust enrichment claim. *Compare T.D. Bank, N.A. v. JP Morgan Chase Bank, N.A.*, No. 10-CV-2843, 2010 U.S. Dist. LEXIS 109471 (E.D.N.Y. Oct. 14, 2010) (Bank's failure to allege privity or direct dealings between itself and party do not defeat claims for unjust enrichment); *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 708 (App. Div. 1st Dept. 1990) (noting that "(i)t does not matter whether the benefit is directly or indirectly conveyed" in addressing an unjust enrichment claim where the parties had direct contact with one another); *Dreieck Finanz AG v Sun*, No. 89 Civ. 4347, 1989 U.S. Dist. LEXIS 9623, at *13 (S.D.N.Y. Aug. 14, 1989) (The District Court, in applying New York law, concluded it was not "necessary for plaintiff and defendant to have had direct dealings with one another."); *with Sperry v. Crompton Corp.*, 810 N.Y.S.2d 488, 489 (App. Div. 2nd Dept. 2006) (affirming lower court's decision to dismiss plaintiff's claim to recover damages for unjust enrichment because plaintiff lacked privity

---

[8]     "In order to prove unjust enrichment, the Receiver must show: (1) that he conferred a benefit on Defendants, (2) who had knowledge thereof, (3) that Defendants voluntarily accepted and retained the benefit conferred, and (4) that the circumstances are such that it would be inequitable for Defendants to retain the benefit without paying the value thereof to the Receiver." (*Goldberg v. Chong*, No. 07-20931, 2007 U.S. Dist. LEXIS 49980, at *23 (S.D. Fla. July 11, 2007) (citing *Nova*, 365 F.3d 996 at 1006-07.)).

with defendants); *Xaleron Pharm., Inc. v. Actavis, Inc.*, No. 150587/2016, 2016 N.Y. Misc. LEXIS 3271, at *12 (Sup. Ct. N.Y. Cty. Sept. 12, 2016) ("[A] plaintiff cannot succeed on an unjust enrichment claim unless it has a sufficiently close relationship with the other party that 'could have caused reliance or inducement.'") (quoting *Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 517 (2012)); *Ambrosino Constr. Corp. v. Galasso*, 975 N.Y.S.2d 707 (Sup. Ct. 2013) (unjust enrichment claim dismissed for lack of privity).

Until recently, California's case law on whether a plaintiff could proceed with an unjust enrichment claim as an independent cause of action "was uncertain and inconsistent." *Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 U.S. App. LEXIS 12833, at *2 (9th Cir. July 17, 2017). As the Ninth Circuit in *Bruton* recognized, the California Supreme Court has permitted plaintiffs to bring independent claims for unjust enrichment. *Id.* However, in California, a lack of a direct relationship between the parties is not necessarily fatal to their unjust enrichment claim. *See Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 998 (2015) ("[A] privity of relationship between parties is not necessarily required.") (citing *Buss v. Superior Court*, 16 Cal. 4th 35, 51 (1997)); *CTC Real Estate Servs. v. Lepe*, 140 Cal. App. 4th 856, 861 (2006) ("[D]octrine of unjust enrichment [is] a theory which can, in some instances, have validity without privity of relationship." (quoting *Kossian v. Am. Nat'l Ins. Co.*, 254 Cal. App. 2d 647, 650 (1967))).

Plaintiffs are given leave to amend their unjust enrichment claims under California, Florida, and New York. In doing so, Plaintiffs should be mindful of the differences in each state's unjust enrichment law, in order to sufficiently plead them, or whether to bring them at all based upon whether a claim can be stated.

As a final note, in the SAC, it is unclear if the unjust enrichment claims are brought solely within each of the proposed subclasses, or whether Plaintiffs seek a nationwide class with an unjust

enrichment claim. If Plaintiffs intend to assert an unjust enrichment claim on behalf of a nationwide class, they must, in their amended pleadings, specify upon which states' laws they rely.

## III. <u>CONCLUSION</u>

For the foregoing reasons, JJCI's Motion to Dismiss is **GRANTED in part and DENIED in part** as follows: (i) JJCI's motion is denied as to Counts one through eight, which are Plaintiffs' "failure-to-warn and omission" claims; (ii) the motion is granted as to Count Nine, negligent omission, and Count Ten, unjust enrichment, and those claims are dismissed without prejudice, with the exception of the New Jersey unjust enrichment claim, which is dismissed with prejudice; and (iii) Plaintiffs' request for injunctive relief is struck from the SAC. Plaintiffs are given leave to amend their negligent omission and unjust enrichment claims in accordance with the dictates of this Opinion. When amending their complaint, Plaintiffs must also clarify which of the seven products listed in the SAC were purchased and used by Plaintiffs and/or their children. *See infra*. The Third Amended Complaint must be filed no later than 21 days from the date of the Order accompanying this Opinion.

Dated: May 28, 2021

    /s/ Freda L. Wolfson
Freda L. Wolfson
U.S. Chief District Judge